**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **CORDELL THORN,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **No. 20 C 7377** |
| | ) | |
| **MINDY NURSE,**[1] | ) | **Judge Rebecca R. Pallmeyer** |
| | ) | |
| **Respondent.** | ) | |

## MEMORANDUM OPINION AND ORDER

Stacy Anderson was shot and killed in the early morning hours of June 26, 2005 in Chicago. Cordell Thorn was charged in the shooting and, in 2008, convicted by a jury of first-degree murder and aggravated battery with a firearm. Thorn is currently serving consecutive 45-year and ten-year prison terms in Illinois state prison. Having exhausted the state appellate process, Thorn petitions for a writ of habeas corpus under 28 U.S.C. § 2254. He asserts numerous claims: that the State failed to prove him guilty beyond a reasonable doubt and that it violated his due process rights by introducing perjured testimony; that the trial court improperly admitted character evidence; that he received ineffective assistance of counsel from his trial and appellate lawyers; and that the trial judge failed to adhere to Illinois Supreme Court Rule 431(b) and unconstitutionally coerced a guilty verdict. Of these arguments, Thorn's jury coercion claim is not defaulted and has merit. For the reasons explained here, the court grants Thorn's petition and orders the State to release Thorn or retry him within 60 days.

---

[1] Since the filing of this petition, Thorn has been transferred from the Western Illinois Correctional Center to the Pontiac Correctional Center. Accordingly, pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Mindi Nurse is substituted as Respondent.

## BACKGROUND[2]

### I.    Trial Proceedings

Early in the morning of June 26, 2005, approximately ten shots were fired at a house on the south side of Chicago.  (Direct Appeal at 2.)  Stacey Anderson, Anthony Miller, Gloria Jones, and Lorenzo Hicks were outside of the house, socializing.  (*Id.* at 6.)  Anderson was killed in the shooting and Miller sustained gunshot wounds to his foot and leg.  (*Id.*)

Chicago police arrived at the scene of the crime shortly after the shooting.  Jones provided them with a description of the shooter as a Black man wearing a white t-shirt, light jeans, and Air Force One shoes.  (Collateral Appeal ¶ 7.)  Later that same day, Chicago police detectives James Butler and John Otto met with Jones and showed her what the parties refer to as a photo "array"— but what this court understands to be photos of "one or two" potential suspects, one of them being Petitioner Thorn.  (*Id.*)  Detective Otto would testify at Thorn's trial that Thorn was included in the photos based on information Otto had received from Antonio Williams, an individual who was in police custody on the day of the shooting on an unrelated charge.  (Direct Appeal at 7.)  Jones was unable to identify the shooter from the photo(s).  (Collateral Appeal ¶ 10.)  About one week later, however, on July 2, the detectives asked Jones to view an in-person lineup; at this point, Jones made a positive identification of Thorn.[3]  (*Id.* ¶ 8.)

---

[2]    The court primarily relies on the factual findings of the state appellate court opinions on direct and postconviction appeal.  *See generally People v. Thorn*, No. 1-08-1673 (Ill. App. Ct. Dec. 23, 2010) [17-4] (hereinafter "Direct Appeal"); *People v. Thorn*, 2020 IL App (1st) 170375-U [17-10] (hereinafter "Collateral Appeal").  In federal habeas corpus proceedings, a state court's factual findings are presumed correct unless they are rebutted "by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); *see also Jean-Paul v. Douma*, 809 F.3d 354, 360 (7th Cir. 2015).

[3]    The record does not indicate how many individuals were included in the in-person lineup; however, Thorn was the only individual in the lineup who also appeared in the photos shown to the witnesses.  (Direct Appeal at 2; *see also* Brief and Argument for Defendant-Appellant, Ex. 1 to Answer to Pet. [17-1] at 9.)

There was one other identification witness: Based on information they had received from Williams, the jailhouse informant, detectives met with an individual named Willie Triplett on June 27, the day after the shooting. (Direct Appeal at 7.) Triplett was not at the scene of the crime but testified that he was down the street "working on" his car and saw the perpetrators circling the block in their vehicle and subsequently fleeing the scene on foot after the shooting. (*Id.* ¶ 13.) Later that day, Triplett identified Thorn in the photo "array" (again, as this court understands the record, just one or two photographs) and then identified him again a week later in a physical lineup. (*Id.* ¶ 14.) Two other individuals who were among those outside the house at the time of the shooting—Anthony Miller and Lorenzo Hicks—also viewed an in-person lineup that included Petitioner Thorn, but neither man could identify anyone as the shooter. (Ex. 1 to Answer to Pet. for Writ of Habeas Corpus (hereinafter "Answer to Pet.") [17-1] at 10.)

Thorn himself was at Chicago Police Department Area 2 Headquarters, having been arrested and detained there on July 2 for unrelated trespassing charges. (Direct Appeal at 2, 7–8, 11; *see also* Ex. 1 to Answer to Pet. at 10.) Shortly after he arrived at Area 2, Detectives Butler and Otto began interrogating him about multiple murders, including the murder of Anderson. (Direct Appeal at 7–8, 11; Ex. 1 to Answer to Pet. at 10.) The interrogations spanned three days in total (Ex. 1 to Answer to Pet. at 25) during which Thorn was not represented by an attorney. (*See* Direct Appeal at 8, 12.) Initially, Thorn denied being at the scene of Anderson's murder; ultimately, however, he gave a written statement admitting to being the shooter and stating that Lorenzo Hicks was the target of the shooting.[4] (Collateral Appeal ¶¶ 21–28.) He was charged with first-degree murder.

Before his trial, Thorn moved to suppress the identification testimony of Gloria Jones and Willie Triplett, as well as his own written confession. (*Id.* ¶¶ 6, 10–11.) Thorn argued that the

---

[4] According to Thorn's appellate brief on direct appeal, he was 22 years old at the time of his interrogation, had completed school through the eighth grade, and is learning disabled. (Ex. 1 to Answer to Pet. at 25.)

3

photo display suggested Thorn was the shooter and that the lineup procedure was flawed. Specifically, Thorn argued that the investigative procedures were faulty because the photo "array" included just one or two photos and because the witnesses were shown Thorn's photo—and at most one other—which would have primed them to identify him in the lineup.  (*Id.* ¶ 11.)  Jones herself testified at the pre-trial hearing that she had been unable to identify Thorn in the photo she was shown on the day of the shooting.  (*Id.* ¶ 7.)  As for his confession, Thorn claimed it was coerced.  (Direct Appeal at 12.)  He testified that Detective Otto punched him and grabbed him by the neck and head and rammed his head into a wall when he refused to admit to the crime. (*Id.*)  Thorn also claimed that Otto threatened him by saying: "Don't you know you can end up dead in here, hurt, and I can charge you with something else[?]"  (*Id.*)

Judge Diane Gordon Cannon, who presided over Thorn's pre-trial proceedings and trial, denied Thorn's motion to suppress these pieces of evidence, ultimately finding nothing wrong with the identification procedures and finding Thorn's accusations of abuse not credible.  (*Id.* at 2.)

Thorn's trial began on April 16, 2008.  (*Id.* at 1–2.)  Triplett and Jones were the prosecution's key trial witnesses.  Triplett, who had identified Thorn in a photo and lineup, testified that on the night of the shooting, he was working on his car when he saw two men walking through a nearby vacant lot.  (*Id.* at 4.)  He testified that he initially did not get a good look at them because he "wasn't really paying attention" and "just glanced at them."  (*Id.*)  Then, shortly after the men had walked past, Triplett recounted that he heard ten gunshots and saw the same two men running back through the lot.  (*Id.* 4–5.)  Triplett identified Thorn as one of the men running through the lot and testified that Thorn was wearing a dark-colored hoodie.  (*Id.* at 5.)  On cross-examination, Triplett acknowledged that he had drunk two bottles of 40-ounce malt liquor that night, that the lot through which the two men had run was not illuminated with streetlights, and that he did not see a gun in Thorn's hand as he ran past.  (*Id.*)

Jones, the prosecution's other witness, testified that she saw Thorn emerge from nearby bushes and open fire on the front of her home.  (*Id.* at 6.)  She said that she was unable to see

4

him at first, but eventually looked at Thorn for about "ten to fifteen seconds" from about five feet away. (*Id.*) She recalled that she yelled at him and asked him why he was shooting at the house. (*Id.*) She also claimed that the area was lit by her own porchlight and by streetlights. (*Id.*) On direct examination, Jones testified that she did not speak to the responding police that night and claimed that when Detectives Butler and Otto presented her with photos, she refused even to look at them. (*Id.*) Defense counsel impeached that testimony: on cross examination, Jones acknowledged that she did speak with responding officers after the shooting and that she told them that the shooter was about 5' 8"[5] and was wearing a white t-shirt and faded blue jeans. (*Id.* at 7.) She also admitted that at the hearing on Thorn's motion to suppress, she had testified that she had indeed looked at the photos presented by the detectives and was unable to identify Thorn as the shooter. (*Id.*) On redirect, Jones explained that she had been unable to make an identification of Thorn from the photos because she "didn't want to look at the pictures." (*Id.*)

Thorn took the stand at his trial and testified that on the night of the shooting he was living with a family friend named Sirwanta Terry and that he explained this to the detectives when they interrogated him. (Collateral Appeal ¶ 26.) He claimed that Ms. Terry required, as a condition of his living at her home, that he abide by a 10:30 p.m. curfew. (*Id.*) Ms. Terry also testified at trial and corroborated Thorn's testimony. (*Id* ¶ 25.) She explained that Thorn was at her house on the night of the shooting and that she had known Thorn for six years and he was "like a surrogate son" to her. (*Id.*) Thorn's trial testimony also detailed how Detective Otto had coerced his confession by physically and verbally abusing him when he refused to comply with Otto's demand that he confess. (*Id.* ¶ 26–28.)

In rebuttal, Detective Otto testified that, during his interrogations, Thorn did not tell him that he was living with Terry; instead, according to Otto, Thorn had told him that he was staying at the home of his girlfriend's parents. (Direct Appeal at 9–10.) Otto said that after Thorn had

---

[5]     The record does not provide any information on Thorn's actual height.

told him this, Otto went to that address and was greeted by Ronald Burns, Thorn's girlfriend's uncle. (*Id.*; Ex. 1 to Answer to Pet. at 45.) According to Otto, Burns said that Thorn was not living with them on the date of the murder because he had "been thrown out" of the house. (Direct Appeal at 10.) When he confronted Thorn with this information, Otto testified, Thorn claimed instead that he had been staying at the home of his girlfriend's stepfather—but Otto went to this new address and the stepfather, Arnold Mitchell, told Otto that Thorn was "not welcome" there. (*Id.*) Thorn's trial counsel objected to this (evidently hearsay) testimony about Burns and Mitchell's statements to Otto as improper character evidence, but those objections were overruled. (*Id.*) Finally, Detective Otto also denied that he coerced Thorn into making a confession and denied hitting or choking Thorn. (*Id.* at 12–13.)

### A. Jury Deliberations

Jury deliberations began at 1:26 p.m. on Friday, April 18, 2008. By 3:20 p.m., the jurors sent the court a note that said: "We are unable to arrive at a unanimous decision, this jury is hung." (Direct Appeal at 13.) Judge Cannon instructed the jury to continue deliberating; neither party objected. (*Id.*)

In a second note, sent at 4:00 p.m., the jury reported: "We have arrived at an 8 to 4 decision and the four jurors have stated their decision is final." (*Id.*) Without objection from either party, the court again instructed the jury to continue deliberating. (*Id.*)

At 5:00 p.m., the jury sent a third note. In this third note, they wrote that the "jury is still deadlocked at 8 to 4 and all jurors have stated their positions will not change. P.S. four jurors do not accept [Thorn's] written confession or [the] testimony of Gloria Jones." (*Id.*) Again, the court instructed the jury to continue deliberating; again, neither party objected. (*Id.*)

But there was no immediate progress. At 5:40 p.m., the jury sent the court its fourth note, which read as follows: "Dear Judge Cannon, some of the jurors have verbally raised their voices in an aggressive and could be considered hostile manner. Tempers are at an end and frustration has set in. Jurors are requesting to be sent home as their positions on the Thorn matter are final."

(*Id.*) This time, defense counsel objected to the court's proposed instruction that the jury continue deliberating. (*Id.*) Over that objection, Judge Cannon gave the jury instructions as directed in *People v. Prim*, 53 Ill. 2d 62, 289 N.E. 2d 601 (1972), commonly referred to in Illinois as the "deadlock instruction;" thus, the court explained that

> to return a verdict, it is necessary that each juror agrees thereto. Your verdict must be unanimous. It is your duty as jurors to consult with one another and to deliberate with a view to reaching an agreement if you can do so without violence to individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of evidence with your fellow jurors. In the course of your deliberations, do not hesitate to re-examine your own views and change your opinion if convinced it is erroneous, but do not surrender your honest convictions as to the weight or effect of the evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict.

(*Id.* at 13–14.)

After receiving the court's instructions, the jury was sent back to continue deliberating.

Again, there was no progress. At 6:30 p.m., the jury sent its fifth note to the court:

> There are <u>four</u> points of contention, four jurors do not believe Det. Otto is credible. They believe he choked and strangled Cordell Thorn and forced him to sign the confession. The <u>same four</u> do not believe the testimony of Gloria Jones and her identification of Thorn as the shooter. The four jurors also believe the testimony of [Sirwanta Terry] and that the testimony of Cordell Thorn was credible. We have reexamined the evidence and deliberated again with the same unchanged vote of 8 to 4.

(*Id.* at 14 (emphasis in original).) The court instructed the jury to continue to deliberate; neither party objected to the instruction. (*Id.*)

After more deliberations,[6] the jury sent back a sixth note: "One juror, large black female with glasses has stated in front of all jurors that she will not change her vote because you (Judge Cannon) believes [sic] he is guilty. She has repeated this remark several times." (*Id.* at 15.) In response to this sixth note, Judge Cannon responded, simply: "You have the instructions. Please continue to deliberate. Thank you." (*Id.*) The parties did not object to Judge Cannon's instruction. (*Id.*)

---

[6] The jury's sixth note did not indicate the time it was sent.

At 7:30 p.m., after over six hours of deliberating, the jury sent Judge Cannon its seventh note:

> We are still deadlocked at 8 to 4 no progress is anticipated as all jurors have stated their position is final.  P.S. all deliberation has come to a standstill.  We have jurors who have special needs; medication, confirmation of weekend stay, contact with family members and employer.  Judge Cannon, will we deliberate tomorrow if we have not reached a unanimous decision tonite[?] Also, we have concerns regarding our vehicles parked in the county parking lot.  Thank you.

(*Id.*)  After receiving this note, Judge Cannon informed the parties that she intended to give the jury the following instruction: "Please make a list of phone numbers and persons you would like the deputy to notify.  At 8:30 p.m. you are going to be sequestered.  We will resume deliberations at 9:30 a.m. if you are unable to reach a verdict this evening."  (*Id.*)  Defense counsel objected to the court's proposed instruction and requested that the court declare a mistrial.  (*Id.*)  Judge Cannon denied that request, overruled defense counsel's objection, and admonished the jurors with the sequestration instruction.  (*Id.*)

At 8:00 p.m., thirty minutes after receiving the court's sequestration instruction, the jury sent its eighth note.  This one stated:  "We have taken another vote and have arrived at a new position of 9 to 3."  (*Id.* at 15–16.)  The court replied to the jury's eighth note by telling them to "take all the time you need to continue your deliberations."  (*Id.* at 16.)  At 8:30 p.m.—the exact time the jury was scheduled to be sequestered—they returned a unanimous guilty verdict.[7]  (*Id.*)

Thorn filed a post-trial motion arguing that the State failed to prove him guilty beyond a reasonable doubt.  Thorn also argued in his post-trial motion that the trial court coerced the jury into returning a guilty verdict and that the court erred in refusing to declare a mistrial and discharge the jury.  (*Id.*)  Judge Cannon denied Thorn's motion, explaining that the evidence was sufficient and that there was nothing improper about the jury notes or her responses to them.  (*Id.*)  The

---

[7]    Certified photocopies of each juror note are available in the record.  (*See* Ex. 1 to Answer to Pet. at 62–70.)

judge later sentenced Thorn to forty-five years' in prison for first degree murder and to a consecutive term of ten years' imprisonment for aggravated battery with a firearm. (*Id.*)

## II.    Direct Appeal

Thorn appealed his conviction to the Appellate Court of Illinois, First District ("Illinois Appellate Court") arguing that (1) the prosecution failed to prove him guilty beyond a reasonable doubt, (2) the trial court coerced a guilty verdict when it instructed the jury to continue deliberating, (3) the trial court failed to properly instruct the jury during voir dire in accordance with Illinois Supreme Court Rule 431(b),[8] and (4) the trial court improperly admitted evidence of his "bad character" when Detective Otto testified that Burns and Mitchell had told him that Thorn was "thrown out" and "not welcome" at their homes. (*See* Ex. 1 to Answer to Pet. at 7.) The Illinois Appellate Court affirmed Thorn's conviction. (Direct Appeal at 29.) It found Thorn's insufficiency-of-evidence argument meritless, and held that the remainder of his claims were forfeited because he failed to preserve them by not objecting at trial as well as raising them in his post-trial motion. (*Id.* at 17–18, 23–29.) The court also ruled that the plain error exception to the forfeiture rule did not revive Thorn's claims. (*Id.* at 17, 18, 28.)

Thorn then filed a petition for leave to appeal ("PLA") to the Illinois Supreme Court. (Ex. 5 to Answer to Pet. [17-5].) In his PLA, Thorn only raised two claims: his jury coercion claim and

---

[8]    Illinois Supreme Court Rule 431(b) states:
The court shall ask each potential juror, individually or in a group, whether that juror understands and accepts the following principles:
(1) that the defendant is presumed innocent of the charge(s) against him or her;
(2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt;
(3) that the defendant is not required to offer any evidence on his or her own behalf; and
(4) that if a defendant does not testify it cannot be held against him or her; however, no inquiry of a prospective juror shall be made into the defendant's decision not to testify when the defendant objects.
The court's method of inquiry shall provide each juror an opportunity to respond to specific questions concerning the principles set out in this section.

ILL. SUP. CT. R. 431(b).

his Rule 431(b) claim. (*Id.* at 13–20.) The Illinois Supreme Court denied Thorn's PLA on May 25, 2011. (Ex. 6 to Answer to Pet. [17-6].)

### III. State Court Collateral Proceedings

Following his unsuccessful PLA, Thorn filed a *pro se* postconviction petition raising eight claims: (1) actual innocence; (2) ineffective assistance of trial counsel for failing to effectively challenge admission of Jones's identification testimony; (3) ineffective assistance of trial counsel for failing to impeach Triplett; (4) ineffective assistance of trial counsel for failing to file a motion to dismiss the indictment; (5) ineffective assistance of appellate counsel for failing to raise a reasonable-doubt challenge regarding whether the police showed a photo array to Jones; (6) ineffective assistance of appellate counsel for failing to raise any legal challenge regarding the impeachment of Jones; (7) ineffective assistance of appellate counsel for failing to argue that the State presented Jones's perjured testimony; and (8) prosecutors' improper introduction of perjured testimony from Jones. (Ex. 7 to Answer to Pet. [17-7] at 16–18.) The trial court dismissed the petition. (*See id.* at 18.) On appeal, Thorn raised only one claim: that his appellate counsel was ineffective for failing to argue on direct appeal that Thorn's due process rights were violated when the State elicited perjured testimony from Jones. (*Id.* at 6.) The Illinois Appellate Court rejected that argument and affirmed the lower court's decision. (Collateral Appeal ¶¶ 49–55.) Thorn's PLA to the Illinois Supreme Court was denied on September 30, 2020. (Ex. 12 to Answer to Pet. [17-12].)

### IV. Habeas Petition

On December 11, 2020, Thorn filed a pro se federal habeas corpus petition, asserting many of the same claims that he raised in his state court appeals and raising a few new ones. In sum, Thorn asserts that he is entitled to relief because: the State failed to prove him guilty beyond a reasonable doubt at his trial and violated his due process rights by presenting Jones's alleged perjured testimony; the trial court unconstitutionally coerced the jury into reaching a guilty verdict, it did not abide by Illinois Supreme Court Rule 431(b), and it improperly admitted evidence

suggesting Thorn's "bad character"; and his trial and appellate counsel were ineffective for a variety of reasons.  (Pet. for Writ of Habeas Corpus – Person in State Custody [6] at 6–44.)

## LEGAL STANDARDS

The federal habeas statute "unambiguously provides that a federal court may issue the writ to a state prisoner 'only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.' "  *Wilson v. Corcoran*, 562 U.S. 1, 5, (2010) (quoting 28 U.S.C. § 2254(a)).  Additionally, the statute, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), provides that federal courts may not grant a state prisoner's habeas petition on any claim adjudicated on the merits in state court unless that court's decision resulted in a ruling that: (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  A state court decision is "contrary to" clearly established federal law if it applies a rule that contradicts governing law set forth by the United States Supreme Court or reaches a conclusion that diverges from Supreme Court precedent when faced with materially indistinguishable facts.  *Bell v. Cone*, 535 U.S. 685, 694 (2002).  A state court decision contains an "unreasonable application" of clearly established federal law if "the state court identifies the correct governing legal principle" from the relevant Supreme Court decisions "but unreasonably applies that principle to the facts of the prisoner's case."  *Holland v. Jackson*, 542 U.S. 649, 652 (2004) (internal quotation marks and citation omitted).  "[A]n unreasonable application of federal law is different from an incorrect application of federal law."  *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Williams v. Taylor*, 529 U.S. 362, 410 (2000)).  To be entitled to federal habeas relief under § 2254, a petitioner must show that the state court's ruling was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *Harrington*, 562 U.S. at 103.

The language of § 2254(d) expressly limits AEDPA's deferential standard to claims that were "*adjudicated on the merits* in State court proceedings." 28 U.S.C. § 2254(d) (emphasis added); *Johnson v. Williams*, 568 U.S. 289, 298 (2013). Accordingly, a federal habeas court will apply the traditional, pre-AEDPA standard of *de novo* review of legal and mixed legal-factual rulings to claims that were not adjudicated on the merits. *Myers v. Neal,* 975 F.3d 611, 622 (7th Cir. 2020) (conducting *de novo* review of habeas claim that state court did not adjudicate on the merits). The Supreme Court has instructed, however, that when a state court has denied relief on a federal claim, "it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Harrington*, 562 U.S. at 99.

Even before a federal court can reach the merits of a habeas petition, there are a number of procedural obstacles a petitioner must navigate. Several procedural barriers may bar a federal habeas court from reaching the merits of a claim; two are relevant to Thorn's petition. The first is the Court's exhaustion doctrine, which requires state prisoners to "give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). The second is the "independent and adequate state law grounds" doctrine, which provides that state court judgments based on "a state law ground that is *independent* of the federal question and *adequate* to support the judgment" will not be reviewed by a federal habeas court. *Lee v. Kemna*, 534 U.S. 362, 375 (2002) (emphasis in original) (internal quotation marks and citation omitted). The "independent and adequate state grounds" doctrine applies to both substantive and procedural state law rules. *Id.* The Supreme Court has made clear that "[o]rdinarily, a violation of a state procedural rule that is firmly established and regularly followed . . . will be adequate to foreclose review of a federal claim." *Cruz v. Arizona*, 598 U.S. 17, 25–26 (2023) (quoting *Lee*, 534 U.S. at 376). The Court has, however, carved out a narrow exception for rare cases where

a "generally sound rule" is applied in a way that "renders the state ground inadequate to stop consideration of a federal question." *Id.* (internal quotation marks and citation omitted).

## DISCUSSION

Having laid out the relevant legal standards, the court now addresses the various claims Thorn raises in his habeas petition.

## I. Many of Thorn's Trial Error Claims are Procedurally Defaulted

The State argues that Thorn failed to present a number of his claims through one complete round of the State's appellate review process, and therefore has failed to exhaust the claims. In order to exhaust state remedies in the Illinois courts, a petitioner "must include his claims in a [PLA] to the Illinois Supreme Court." *Weaver v. Nicholson*, 892 F.3d 878, 886 (7th Cir. 2018) (internal quotation marks and citations omitted). On direct appeal, Thorn argued that the state failed to prove him guilty beyond a reasonable doubt, and that the court admitted improper character evidence. (Ex. 1 to Answer to Pet. at 21–27, 45–49.) He neglected to raise these issues in his direct appeal PLA to the Illinois Supreme Court, however. (*See* Ex. 5 to Answer to Pet. at 13–20).

In his state postconviction petition, Thorn argued that trial counsel was ineffective in failing to impeach Triplett's testimony, that appellate counsel was ineffective by failing to challenge the evidence of Jones's identification; that the prosecution presented perjured testimony, thus violating due process [9]; and that trial counsel was ineffective in failing to move to dismiss the indictment. (Ex. 7 to Answer to Pet. at 16–18.) Thorn failed to present those arguments in his appeal from the denial of his post-conviction petition to the Illinois Appellate Court, however, nor

---

[9] Thorn did completely exhaust his claim of ineffective assistance of appellate counsel for failing to argue that the State elicited Jones's perjured testimony, but that does not preserve the claim that the State violated Thorn's due process rights by introducing perjured testimony. *See McGhee v. Watson*, 900 F.3d 849, 853 (7th Cir. 2018) ("[A]n assertion that one's counsel was ineffective for failing to pursue particular constitutional issues is a claim separate and independent of those issues.") (quoting *Lewis v. Sternes*, 390 F.3d 1019, 1026 (7th Cir. 2004))

did he raise them in his subsequent PLA to the Illinois Supreme Court (*see id.* at 19–29; Ex. 7 to Answer to Pet. at 5–7). That leaves the claim that appellate counsel was ineffective in failing to argue that trial counsel was ineffective in failing to move to dismiss the indictment. Thorn did not raise that claim at all, in either his direct appeal (*see generally* Ex. 1 to Answer to Pet.) or his collateral appeal (*see generally* Ex. 7 to Answer to Pet.). Accordingly, the court agrees with the State that all of these claims are procedurally defaulted. Thorn does not suggest that there was cause for his default, nor does he argue that a fundamental miscarriage of justice will occur if the court fails to consider these claims, and thus his claim for habeas relief based on these claims is barred. *See Bush v. Shafter*, 35 F. App'x 234, 238 (7th Cir. 2002).

## II. Claims Related to Rule 431(b) are Not Cognizable on Habeas Review

Thorn also raised two claims related to Illinois Supreme Court Rule 431(b): Specifically, he contends that the trial court denied him an impartial jury by failing to ensure that the jurors understood and accepted that Thorn was to be presumed innocent and that he had a right to not present evidence, as required by Rule 431(b); and that the Illinois Appellate Court's review of this claim for plain error was improper. Respondent argues that those claims are not cognizable on habeas review. This court agrees. Federal habeas relief is limited to violations of a petitioner's federal constitutional rights. *Wilson*, 562 U.S. at 5. The Illinois Supreme Court has made clear that: "Defendants do not have a right to Rule 431(b)(4) questioning under either the United States or the Illinois Constitution. A defendant's 'right' to such questioning . . . is the product of this court's inherent power to make rules regulating the conduct of the circuit courts." *People v. Glasper*, 234 Ill. 2d 173, 196, 917 N.E.2d 401, 415–16 (2009). Accordingly, courts in this district have "consistently rejected habeas corpus claims based on violations of Illinois Supreme Court Rule 431(b)." *Wilmington v. Williams*, No. 16-CV-3787, 2023 WL 2306826, at *14 (N.D. Ill. Mar. 1, 2023) (collecting cases). Thorn's claims stemming from Rule 431(b) fail because they do not present a federal issue.

### III. Claims of Ineffective Assistance of Appellate Counsel Lack Merit

Thorn has argued that appellate counsel was ineffective for failing to argue that the State knowingly elicited perjured testimony from Jones. The State acknowledges that this claim is not procedurally barred and is cognizable on habeas review. The State argues that the claim nevertheless fails, however, under the deferential standard established by AEDPA. The court agrees.

On collateral appeal, the Illinois state courts adjudicated Thorn's ineffective assistance of counsel claim on the merits, so this court's review is governed by the standard set forth in § 2254(d). As noted, under that standard, the habeas petitioner can prevail only if the state court's ruling "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Bryant v. Brown*, 873 F.3d 988, 995 (7th Cir. 2017) (quoting *Harrington*, 562 U.S. at 103). The *Strickland* standard for Sixth Amendment claims of ineffective assistance of counsel asks "whether counsel's performance was deficient and, if so, whether the deficient performance prejudiced the petitioner." *Id.* (citing *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984)). The standard contains two steps. *Id.* First, a reviewing court considers "whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. This circuit has noted that there is a "strong presumption that counsel's representation falls within a wide range of reasonable representation." *Bryant*, 873 F.3d at 996 (quoting *Strickland*, 466 U.S. at 689–90). Second, the standard's prejudice inquiry asks whether there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Moreover, "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant"; if "it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." *Id.* at 697.

15

As the Supreme Court has explained, "establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Harrington*, 562 U.S. at 105. This is because both *Strickland* and § 2254(d) are highly deferential, and when the two standards are examined together, review is "doubly deferential." *Knowles v. Mirzayance*, 556 U.S. 111, 129 (2009). Thus, "when § 2254(d) applies, the question is not whether counsel's actions were reasonable"; rather, "[t]he question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington*, 562 U.S. at 105.

The state appellate court evaluating Thorn's collateral appeal concluded that Thorn failed to demonstrate prejudice resulting from appellate counsel's failure to challenge the State's use at trial of Jones's perjured testimony. (Collateral Appeal ¶ 52.) The court came to this conclusion by noting that Thorn's trial counsel did expose the inconsistencies of Jones's statements during the trial. (*Id.* ¶ 51.) The state court's opinion explains that Thorn's trial counsel "fully explored" those inconsistencies in during cross-examination of her and again in closing argument, and that the jury nonetheless returned a guilty verdict. (*Id.*) Therefore, according to the state court, Thorn could not show that the alleged perjury violated his due process rights by affecting his verdict. (*Id.*) This was not an "unreasonable" way to resolve Thorn's *Strickland* claim. True, there was no physical evidence linking Thorn to the crime, and Jones was the prosecution's sole eyewitness to the shooting; her credibility was thus crucial to the State's case against Thorn. Still, a plausible reading of the state court's ruling is that by elucidating inconsistent statements from Jones, the State assisted Thorn's defense by effectively opening the door for impeachment and enabling him to cast doubt on Jones's credibility. This is not the only possible interpretation of the effect Jones's testimony had on Thorn's guilty verdict—nor even the most plausible—but the state court's no-prejudice ruling is within the bounds of § 2254(d) reasonableness. Thus, the court finds that Thorn's ineffective-assistance grounds for habeas relief fail to pass muster under AEDPA.

IV.     **Thorn's Claims of Jury Coercion are Meritorious**

A.      **Procedural Default**

Finally, the court reaches Thorn's jury coercion claim. The State argues that this claim is procedurally defaulted because it was decided on independent and adequate state law grounds. Specifically, the State points out that on direct appeal the Illinois Appellate Court found that Thorn had forfeited his jury coercion claim by failing to object at trial to the court's jury instructions. (*See* Answer to Pet. [16] at 11–13.) The court finds, however, that the Illinois court's decision that Thorn forfeited his claim is not adequate to preclude review of the federal question.

There can be no procedural default where a violation of state procedure never *actually* occurred—meaning that this claim is not defaulted if trial counsel did not in fact forfeit it. *See Kubat v. Thieret*, 867 F.2d 351, 366 n.11 (7th Cir. 1989) (finding a procedural bar inadequate where Illinois court ruled that the petitioner waived the claim but the "record clearly show[ed] . . . that [petitioner] did in fact raise and argue the issue"); *see also Jones v. Sec'y, Dep't of Corr.*, 778 Fed. App'x. 626, 633 (11th Cir. 2019) (stating that "[t]he procedural default doctrine self-evidently is limited to cases in which a 'default' actually occurred—i.e., cases in which the prisoner actually violated the applicable state procedural rule") (collecting cases). Illinois law requires two things to preserve an issue for appellate review: a trial objection and a written post-trial motion raising the claim. *People v. Enoch*, 122 Ill. 2d 176, 186, 522 N.E.2d 1124, 1130 (1988); *see also Aliwoli v. Gilmore,* 127 F. 3d 632, 634 (7th Cir. 1997). The record in Thorn's case demonstrates that he satisfied both of these requirements. Indeed, while the Illinois Appellate Court ruled on direct appeal that Thorn had forfeited his jury-coercion claim, its own recounting of the facts shows otherwise. The Illinois Appellate Court's opinion on Thorn's direct appeal unambiguously accepted that Thorn objected to the court's deadlock instructions after the jury sent its fourth note (Direct Appeal at 13 (stating that "[o]ver defense counsel's objection the court instructed the jury under *People v. Prim*")); that Thorn objected to the court's sequestration instructions after the jury sent its seventh note (*id.* at 15 (stating that "[d]efense counsel objected to the jury being

17

sequestered and asked the court to consider hanging the jury")); and that Thorn's post-trial motion raised his jury coercion claim (*id.* at 16 (stating that Thorn's post-trial motion "argued that the four jurors who said they were 'holding out for not guilty' were pressured into changing their verdict")). Then, inexplicably, that court's opinion reached a conclusion contrary to those findings: the court stated that "[d]efendant acknowledges that he did not object at trial to the court's responses to the jury notes" and ruled that Thorn had waived the claim. (*Id.* at 18.) But the facts as recited show that Thorn did indeed object. He complied with the letter as well as the spirit of Illinois's forfeiture rule.

The court further highlights that in addition to being internally inconsistent with its own opinion, the Illinois Appellate Court's claim that Thorn "acknowledge[d]" that he did not preserve the issue for appeal is not supported by the appellate briefing; to the contrary, in his reply brief Thorn plainly argues that he preserved the issue. (Reply Brief and Argument for Defendant-Appellant, Ex. 3 to Answer to Pet. [17-3] at 9 ("The State's argument that this issue is forfeited is also without merit. Thorn objected to the court's decision to read the jury the *Prim* instruction after the fourth jury note, and objected to the court's decision to sequester the jury after the seventh jury note. In Thorn's post-trial motion, he argued that the trial court erred in refusing to hang the jury after they repeatedly indicated that they were divided 8 to 4 and would be unable to reach a unanimous decision. Thus, the purpose of preserving a claim of error was met, and the 'trial court clearly had an opportunity to review the same essential claim that was later raised on appeal.' " (internal citations omitted)).)

On this record, this court has no difficulty concluding that the state court's ruling is inadequate. *See Walker v. Martin*, 562 U.S. 307, 320 (2011) ("[a] state ground, no doubt, may be found inadequate when 'discretion has been exercised to impose novel and unforeseeable requirements without fair or substantial support in prior state law") (citation omitted). Indeed, just this past term the Supreme Court held that "unforeseeable and unsupported state-court decisions on a question of state procedure do[ ] not constitute an adequate ground to preclude . . . review

of a federal question." *Cruz*, 598 U.S. at 26. Here, the court is unsure whether the Illinois Appellate Court's ruling was the result of an unintentional error misapplying the facts to the law, or if that court simply misconstrued Illinois's forfeiture rule. But either way, the ruling is inadequate to bar the courts review of the federal claim.

The Supreme Court's framework in *Lee v. Kemna* provides an additional lens through which to see the inadequacy of the State's finding on procedural default. The *Lee* Court established the standard for evaluating when a federal habeas court may reach the merits of a claim that a state court previously decided was procedurally waived. The Court in *Lee* considered the adequacy of a Missouri state court's application of its rules for seeking a continuance, and specifically whether the state court ruling procedurally barred the petitioner's habeas claim. In that case*,* three alibi witnesses left the courthouse on the day they were scheduled to testify in Defendant Lee's murder trial. *Lee*, 534 U.S. at 369. Lee orally moved for a continuance until the next morning, but the trial judge denied the motion because he was unable to conduct the trial the following day, and then refused to continue the case until the following week, when he had another trial set. *Id.* at 370. Consequently, trial resumed without delay, no alibi witnesses testified, the jury found Lee guilty of first-degree murder, and he was sentenced to life without possibility of parole. *Id.* at 366, 371. Lee argued on appeal that he was deprived of due process by denial of his continuance; but the Missouri Court of Appeals ruled that he had waived the claim by failing to make his continuance motion in writing, supported by an affidavit, as required by Missouri procedural rules. *Id.* at 371, 373.

In federal habeas proceedings, the federal district court and the Eighth Circuit held Lee's due process claim procedurally barred. The Supreme Court reversed, however, holding that Missouri's application of its continuance rule was inadequate to support a procedural default. *Lee*, 534 U.S. at 376. In reaching that decision, the Supreme Court was guided by its ruling in *Osborne v. Ohio*, 495 U.S. 103, 110 (1990), where the Ohio Supreme Court had concluded that defendant was procedurally barred from raising a constitutional challenge to jury instructions

19

because he had not objected contemporaneously when the judge charged the jury. *Osborne*, 495 U.S. at 107–08. Reversing that conclusion, the U.S. Supreme Court acknowledged that Osborne had not raised his objection at trial, but noted that he had nonetheless preserved the issue by earlier arguing—in an unsuccessful motion to dismiss—that the prosecution lacked proof on the legal element at issue. *Id.* at 124. Because the trial judge "in no uncertain terms rejected counsel's argument [related to the legal elements required for conviction]" in defendant's motion to dismiss, the Court reasoned that, under the circumstances, "nothing would be gained by requiring Osborne's lawyer to object a second time [at trial]" and that "no perceivable state interest" was served by requiring adherence to the Ohio rule requiring contemporaneous objection. *Id.* Finally, the Court noted that its decision was directed by "the general principle that an objection which is ample and timely to bring the alleged federal error to the attention of the trial court and enable it to take appropriate corrective action is sufficient to serve legitimate state interests, and therefore sufficient to preserve the claim for review here." *Id.* at 125.

Reasoning from *Osborne*, the *Lee* court articulated "three considerations, in combination" in addressing the procedural default issue. *Lee* 534 U.S. at 381; *see also Flint v. Carr*, 10 F.4th 786, 793–95 (7th Cir. 2021) (applying *Lee*'s three considerations to find that habeas petitioner had not procedurally defaulted his claim). First, the Court noted that there was no evidence that "formally perfect compliance with the Rules would have changed the trial court's decision." *Lee* 534 U.S. at 381, 387. Second, the Court observed that the state had presented no Missouri case law for the proposition that "flawless compliance" with the procedural rule was required "in the unique circumstances" presented. *Id.* at 382, 387. Third, and "most important," the Court highlighted that Lee had "substantially complied" with Missouri's rule and that "the purpose" of the rule was served by Lee's submissions. *Id.* at 382, 387. In finding that Missouri's ruling was inadequate to bar federal habeas review, the Court made clear that only "exceptional cases" would meet the high bar established by its ruling. *Id.* at 376.

In this court's view, Thorn's situation presents that exceptional case—indeed, what may well be a more compelling case for rejecting the procedural default argument. In *Lee*, petitioner did violate the state rule of procedure, if only technically. Thorn, in contrast, did not actually violate a state rule of procedure at all. Respondent in this case does not argue that Illinois's forfeiture rule required Thorn to object to the trial court's resolution of each jury note in order to preserve his jury coercion. And the Supreme Court's holding in *Lee* would defeat any such argument. First, even assuming that Thorn did not comply with Illinois's rules, no evidence suggests that Thorn could have changed the trial court's decision with "formally perfect compliance." *Id.* at 387. There is no basis here for finding that any objection Thorn could have made would have been sustained. When confronted with the jury coercion claim in a post-trial motion—supported by each of the jury notes and her responses to them—Judge Cannon was unmoved. She ruled that "there was nothing improper about the jury notes or the court's responses." (Direct Appeal at 16.) Simply put, Thorn complied with the forfeiture rule, and even if he had gone above and beyond and objected to each jury instruction, it appears this would not have affected the outcome of his jury coercion claim.

*Lee*'s second consideration also weighs in Thorn's favor: Illinois case law does not suggest that "flawless compliance" with the forfeiture rule is required in the context of objections to a judge's conduct; instead, the case law establishes the opposite: that rigid application of the rule is inappropriate in contexts like Thorn's. *See People v. Kliner*, 185 Ill. 2d 81, 161, 705 N.E.2d 850, 890 (1998) (holding of the Illinois Supreme Court that "application of the [forfeiture] rule is less rigid where the basis for the objection is the trial judge's conduct"); *see also, e.g.*, *People v. Schaefer*, 2019 IL App (3d) 170015-U, ¶ 38 (citing *Kliner* in ruling that defendant did not forfeit his claim even though he did not object to trial judge's *ex parte* communications with jury). Illinois courts have explained that "an attorney's objection to a trial judge's comments could prove embarrassing to the attorney or be viewed with skepticism by juries" and "could irreparably damage his or her client's interests," confirming the need to relax the application of the forfeiture

rule in this context.  *People v. Cioni*, 2017 IL App (2d) 150461-U, ¶ 63.  Any argument that Thorn needed to make further efforts to preserve his jury coercion claim fails.  Illinois's forfeiture rule does not establish such a high burden on defendants, but rather requires timely objection and some surfacing of the issue in a post-trial motion.  Further, Illinois case law plainly maintains that its forfeiture rule must be applied less rigidly in the context of objections to a trial judge's conduct.

Finally, and "most important," Thorn more than "substantially complied" with Illinois's forfeiture rule—he fully complied with it by timely objecting to two of the court's jury instructions and raising the issue in his post-trial motion, as described in detail above.  *Lee*, 534 U.S. at 382, 387.  *Lee*'s third consideration favors Thorn.

This court concludes that Thorn fully complied with Illinois's forfeiture rule.  Trial counsel timely objected to the trial judge's responses to the jury's notes and raised the issue in his post-trial motion.  The trial court "clearly had an opportunity to review the same essential claim that was later raised on appeal," achieving the purpose for the Illinois rule.  *People v. Heider*, 231 Ill. 2d 1, 18, 896 N.E.2d 239, 249 (2008).  The application of Illinois's forfeiture rule here was not only "exorbitant" but plainly wrong, meeting the high bar described in *Cruz* and *Lee*.  Thorn did not procedurally default his jury coercion claim.

### B.    Merits

As noted, the deferential standard commanded by AEDPA applies only if a claim "was adjudicated on the merits."  28 U.S.C. § 2254(d); *see Braun v. Powell*, 227 F.3d 908, 917 (7th Cir. 2000).  Here, the Illinois Appellate Court found—incorrectly, as explained above—that Thorn forfeited his jury coercion claim, and disposed of it on procedural grounds.  (*See* Direct Appeal at 18.)  Because Thorn's jury coercion claim was decided on procedural grounds, it was not "adjudicated on the merits."   *See Williams*, 568 U.S. at 308 (Scalia, J., concurring) ("An 'adjudication on the merits' is 'best understood by stating what it is not: it is not a resolution of a claim on procedural grounds.' ") (quoting *Muth v. Frank*, 412 F.3d 808, 815 (7th Cir. 2005)).  Therefore, the court shall not apply the deferential standard of review in § 2254(d) and instead

must employ the pre-AEDPA standard of *de novo* review.[10]  *See Myers,* 975 F.3d at 622.  Because the court has concluded that the State cannot rely upon an independent and adequate state law ground, it turns to the merits of Thorn's jury coercion claim.

The Supreme Court addressed the constitutional rule against jury coercion in *Lowenfield v. Phelps*, 484 U.S. 231, 237–41 (1988), where it held that "[a]ny criminal defendant . . . being tried by a jury is entitled to the uncoerced verdict of that body."  *Lowenfield*, 484 U.S. at 241.  Animating the prohibition against jury coercion is a defendant's due process right to a fair trial.  *United States v. Collins*, 223 F.3d 502, 509 (7th Cir. 2000).  A trial judge unconstitutionally coerces a jury "when jurors surrender their honest opinions for the mere purpose of returning a verdict."  *United States v. Banks*, 982 F.3d 1098, 1102 (7th Cir. 2020) (citing *United States v. Williams*, 819 F.3d 1026, 1030 (7th Cir. 2016)).   In assessing a claim of jury coercion, a reviewing court considers the trial court's conduct "in its context and under all the circumstances."  *Lowenfield*, 484 U.S. at 237; *see also Banks*, 982 F.3d at 1102 ("[w]e assess the risk of juror coercion based on the totality of the circumstances").  The court's inquiry "is objective and focuses on 'the situation facing the juror'; the subjective intent of the judge and the juror are irrelevant."  *Banks*, 982 F.3d at 1102 (quoting *Williams*, 819 F.3d at 1030).

The Seventh Circuit's recent opinion in *United States v. Banks* provides an example of jury coercion sufficient to violate due process.  After four hours of deliberation that lasted until 8:45 p.m., a jury found the defendant in *Banks* guilty on charges of conspiracy and aiding and abetting a robbery.  *Banks*, 982 F.3d at 1100.  At the request of defendant's counsel, the judge polled the jurors pursuant to Federal Rule of Criminal Procedure 31(d).  *Id.*  When polled, the first

---

[10]      This conclusion is not altered by the Illinois Appellate Court's review of the claim under the plain error exception, as the Seventh Circuit has "repeatedly explained that where a state court reviews the claim for plain error as the result of a state procedural bar such as the Illinois doctrine of waiver, that limited review does not constitute a decision on the merits." *Gray v. Hardy*, 598 F.3d 324, 329 (7th Cir. 2010) (collecting cases).  The State concedes this point in its answer to Thorn's habeas petition (Answer to Pet. at 12–13), and cites to *Miranda v. Leibach*, 394 F.3d 984, 992 (7th Cir. 2005) for the proposition that an "Illinois court does not reach the merits of a forfeited claim simply by reviewing it for plain error."

four jurors affirmed the verdict, but the fifth juror did not. *Id.* The court's questions to the fifth juror ("Juror No. 32") resulted in the following colloquy:

> THE COURT: Juror No. 32, is this your verdict as to Ms. Banks?
>
> JUROR NO. 32: Forced into.
>
> THE COURT: Is this your verdict?
>
> JUROR NO. 32: I suppose so.
>
> THE COURT: Is it your verdict that she is guilty on both Counts One and Two?
>
> JUROR NO. 32: I don't know how to answer that.
>
> THE COURT: I'm asking you to answer that at this time.
>
> JUROR NO. 32: I feel like I need more time.
>
> THE COURT: Let me go finish the poll, and then I'll come back to you.

*Id.* at 1101–02. The court went on and polled the remaining jurors and each affirmed the verdict. *Id.* at 1102. After completing the poll, the judge called a sidebar with counsel and expressed concern that the verdict did not sound unanimous. *Id.* Counsel for Banks and the government agreed, and the court instructed the jurors to continue deliberating with the following admonition:

> At this time, ladies and gentlemen of the jury, because the verdict that you have returned . . . with regard to Ms. Tanisha Banks does not appear to be unanimous given the polling of the jury, the [c]ourt is going to direct that you return to your deliberations with regard to Ms. Banks at this time—it's about five minutes after 9:00—and to continue your best, good faith efforts in doing so to attempt to come to a unanimous verdict with regard to Ms. Banks.

*Id.* After 29 minutes of deliberating, the jury returned a guilty verdict. *Id.* The judge polled the jury after this new verdict and this time each juror confirmed the verdict. *Id.* On appeal, the Seventh Circuit vacated the judgement and remanded for a new trial, finding that the totality of the circumstances "created a clear and obvious risk of juror coercion." *Id.* at 1105. The court's opinion highlighted that the factors that most weighed on its decision were "the dissenting juror's troubling responses to the judge's poll questions, the judge's decision to complete the poll

notwithstanding the juror's dissent, the lateness of the hour, and the extreme brevity of the jury's renewed deliberations." *Id*.

The circumstances surrounding Thorn's jury deliberations share several of the troubling characteristics of *Banks*, and include additional disturbing facts as well. To begin, the record in Thorn's case is clear that the jury genuinely believed itself to be deadlocked. Six separate times, spanning over six hours of deliberations, the jury reported that it was deadlocked at eight to four and that their votes were final. The jury insisted that it was deadlocked even after receiving the *Prim* instruction and engaging in more deliberations.

Although not dispositive, the jury's numerical division is significant. That the jurors were divided eight to four (as opposed to, for example, eleven to one) underscores the extent of the disagreement. This is not a case in which a lone juror stalled a verdict; it appears there was instead serious disagreement among the jurors concerning the sufficiency of the evidence. Indeed, the jurors even identified specific points of contention among the jurors. In light of the fact that they had made Judge Cannon aware not only of their numerical division but also the bases for their disagreements, the dissenting jurors could reasonably have perceived her repeated commands to continue deliberating as a message that their concerns were not significant or valid. *See Lowenfield*, 484 U.S. at 239–40 (acknowledging that there is a potential danger for jury coercion when a judge is aware of the numerical division of the jury on the merits of the verdict); *cf. Brasfield v. United States*, 272 U.S. 448, 450 (1926) (holding under the Supreme Court's supervisory powers that a federal judge's affirmative inquiry into how the jury was divided was per se coercive and required reversal). The state trial court's unwillingness to accept that the jury was deadlocked in spite of the jurors' insistence to the contrary very likely created a coercive atmosphere, particularly given Judge Cannon's detailed knowledge of the status of the jury deliberations.

Any doubt as to this conclusion falls away after reading the jury's later notes to Judge Cannon, sent as the evening wore on. In their fourth note, the jurors disclosed that "[s]ome of the

jurors have verbally raised their voices in an aggressive and could be considered hostile manner. Tempers are at an end and frustration has set in. Jurors are requesting to be sent home as their positions . . . are final." (Direct Appeal at 13.) Then there is the jury's sixth note, perhaps the most troubling and telling evidence that the jury was unduly coerced into reaching a verdict. In this one, the foreman flatly conveys that a juror felt pressure from Judge Cannon to reach a guilty verdict: "One juror, large black female with glasses has stated in front of all jurors that she will not change her vote because you (Judge Cannon) believes [Thorn] is guilty. She has repeated this remark several times." (*Id.* at 15.) Instead of acknowledging and dispelling this juror's concern, Judge Cannon ignored the juror's accusation and responded: "You have the instructions. Please continue to deliberate." (*Id.*) This exchange between Judge Cannon and the jury is unsettling and by itself might be sufficient to support a conclusion of jury coercion. At best, Judge Cannon's instruction can be viewed as a cursory response to a jury note that required sensitive and careful attention; at worst, the jurors could reasonably have perceived it as a thinly veiled threat that anything other than a unanimous guilty verdict was unacceptable.

The jury's seventh note does nothing to quell this court's concerns. In the seventh note, the jury again explained that it was hopelessly deadlocked and pleaded with Judge Cannon to be sent home because there were jurors "who [had] special needs; medication, confirmation of weekend stay, contact with family members and employer." (*Id.*) Judge Cannon responded to this note by warning the jurors that she would sequester them for the night if they did not reach a verdict within the next hour. (*Id.*) Put simply, the record here leaves no question that Judge Cannon was openly put on notice that the jurors felt coerced to reach a verdict based on her behavior, yet she chose to ignore the problem.

Lastly, the timing of the final guilty verdict also strongly indicates that Thorn's verdict was coerced. Only thirty minutes after Judge Cannon told the jury they would be sequestered, one of the four jurors on the side of acquittal changed their vote and then thirty minutes after this—and at the exact time the jurors were scheduled to be sequestered—the jury returned a guilty verdict.

*See Lowenfield*, 484 U.S. at 240 (stating that a verdict returned soon after the jury is given an instruction to continue deliberations may signal that a jury was coerced); *see also Banks*, 982 F.3d at 1105; *Williams*, 819 F.3d at 1034.  The timing of the verdict is especially problematic given that the foreperson had just one hour earlier reported that "all deliberation has come to a standstill" after six hours of deliberating.  The most obvious conclusion is that the guilty verdict in this case was the product of the minority jurors' abandoning their positions based on Judge Cannon's instruction, rather than of genuine deliberations.  While Judge Cannon did instruct the jury after its eighth note to "take all the time you need to continue your deliberations," that instruction surely did not cure the threat of sequestration of a tired and anxious jury or the effect of her conduct and communications over the previous seven hours.  Faced with the prospect of being held hostage by the court, the jurors hastily reached a guilty verdict.

The totality of the circumstances—specifically the trial court's relentless denial of the jury's claim that it was deadlocked, the judge's failure to adequately address a juror's statement that she believed that the judge wanted her to return a guilty verdict, and the timing of the guilty verdict in relation to the sequestration instruction—all support the court's conclusion that Thorn's jury was coerced into reaching a guilty verdict.  That coercion violated Thorn's constitutional right to a fair trial.

## <u>CONCLUSION</u>

For the foregoing reasons, Thorn's petition for a writ of habeas corpus [6] is granted on the basis of his jury coercion claim.  This court orders that the State either initiate proceedings to retry Thorn within 60 days or release him from custody immediately.   The court will retain jurisdiction to enforce this direction.

ENTER:

Dated:  December 22, 2023

_____
REBECCA R. PALLMEYER
United States District Judge

27